# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE EQUIFAX, INC.
DERIVATIVE LITIGATION

Civil Action

No. 1:18-CV-00317-TWT

**LEAD PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF
SHAREHOLDER DERIVATIVE SETTLEMENT, AWARD OF
ATTORNEYS' FEES, AND REIMBURSEMENT OF EXPENSES
<u>WITH MEMORANDUM OF LAW IN SUPPORT</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ....................................................................................1

II.    SUMMARY OF FACTUAL AND PROCEDURAL BACKGROUND ........4

    A.    Background to the Litigation ....................................................4

    B.    The Litigation Demands............................................................4

    C.    The Consolidated Action...........................................................5

    D.    The Settlement...........................................................................8

III.   TERMS AND BENEFITS OF THE SETTLEMENT..................................10

IV.    ARGUMENT..........................................................................................13

    A.    The Settlement is Fair, Reasonable, and Adequate and
          Should Be Finally Approved....................................................13

        1.    The Likelihood of Success at Trial ......................................15

        2.    The Range of Reasonableness and Possible Recovery ..........17

        3.    Complexity, Expense, Risk and Duration of
              Further Litigation Support Approval of the Settlement.........19

        4.    The Reaction of Current Equifax Stockholders
              Supports Approval of the Settlement....................................21

        5.    The Stage of the Proceedings Supports
              Approval of the Settlement ..................................................22

        6.    The Settlement is the Result of Good Faith, Arm's Length
              Negotiations Between Experienced and Capable Counsel....23

    B.    The Agreed-To Fee Award is Fair and Reasonable and
          Should Be Finally Approved....................................................25

1. The Court Should Approve the Negotiated Fee ......................................25

2. The Fee and Expense Award is Supported
   by the *Johnson* Factors ..............................................................................26

   a. The Time and Labor Required and the Novelty and
      Difficulty of the Questions Involved .....................................................27

   b. The Amount Involved and the Results Obtained .................................28

   c. The Skill, Experience, and Reputation of Counsel .............................30

   d. The Contingent Nature of the Fee .........................................................31

   e. Awards in Similar Cases .........................................................................31

C. The Service Award should be Approved ................................................32

IV. CONCLUSION ..............................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Activision, Inc. Deriv. Litig.*,
No. CV-06-04771, slip op. (C.D. Cal. July 21, 2008) ...................................... 30

*In re AOL Time Warner S'holder Deriv. Litig.*,
2009 U.S. Dist. LEXIS 124372 (S.D.N.Y. Feb. 1, 2010) ................................ 29

*Bell Atl. Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993) ................................................................................ 19

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984) ................................................................. *passim*

*Blanchard v. Bergeron*,
489 U.S. 87 (1989) ........................................................................................... 27

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ......................................................................................... 25

*Bonner v. City of Prichard*,
661 F.2d 1206 (11th Cir. 1981) ....................................................................... 27

*In re Catfish Antitrust Litig.*,
939 F. Supp. 493 (N.D. Miss. 1996) ................................................................ 27

*In re Cendant Corp. Deriv. Litig.*,
232 F. Supp. 2d 327 (D.N.J. 2002) ........................................................... 21, 32

*In re Chicken Antitrust Litig.*,
560 F. Supp. 957 (N.D. Ga. 1980) ................................................................... 14

*Citron v. Burns,* C.A. No. 7647,
1985 Del. Ch. LEXIS 382 (Del. Ch. Feb. 4, 1985) .......................................... 19

*Cohn v. Nelson*,
375 F. Supp. 2d 844 (E.D. Mo. 2005) ...................................................... *passim*

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ...................................................................... 18, 22

*In re Corrugated Container Antitrust Litig.*,
    659 F.2d 1322 (5th Cir. 1981) ..................................................................... 19-20

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977) ................................................................... *passim*

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D.  297 (N.D. Ga. 1993) ...................................................................... 24

*Fla. Trailer & Equip. Co. v. Deal*,
    284 F.2d 567 (5th Cir. 1960) ............................................................................ 16

*Frame v. Hillman*, C.A. No. 01-1083-A,
    2002 U.S. Dist. LEXIS 28982 (S.D. Cal. July 31, 2002).................................... 20

*Francisco v. Numismatic Guar. Corp.,* No. 06-61677,
    2008 U.S. Dist. LEXIS 125370 (S.D. Fla., Jan. 31, 2008) ............................... 22

*Garst v. Franklin Life Ins. Co.,* No. 97-C-0074,
    1999 U.S. Dist. LEXIS 22666 (N.D. Ala. June 25, 1999) .......................... 17-18

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) ............................................................................... 24

*Gregg v. U.S. Indus., Inc.*,
    887 F.2d 1462 (11th Cir. 1989) ....................................................................... 20

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ......................................................................................... 26

*In re Infinity Broad. Corp. S'holder Litig.*,
    802 A.2d 285 (Del. 2002) ........................................................................... 18, 27

*Ingram v. Coca-Cola Co.*,
    200 F.R.D. 685 (N.D. Ga. 2001) ..................................................................... 26

*Johansen v. Combustion Eng'g, Inc.*,
    170 F.3d 1320 (11th Cir. 1999) ....................................................................... 20

*Johnson v. Georgia Highway Exp. Inc.*,
    488 F.2d 714 (5th Cir. 1974) ................................................................. 26-27, 31

*Jones v. Nuclear Pharmacy, Inc.*,
    741 F.2d 322 (10th Cir. 1984) ........................................................ 13

*Lewis v. Newman*,
    59 F.R.D. 525 (S.D.N.Y. 1973) ....................................................... 15

*Lucas v. Kmart Corp.*,
    234 F.R.D. 688 (D. Colo. 2006) ...................................................... 15

*Maher v. Zapata Corp.*,
    714 F. 2d 436 (5th Cir. 1983) ................................................ *passim*

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ........................................................... 23

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970) ....................................................................... 29

*Milstein v. Werner*,
    58 F.R.D. 544 (S.D.N.Y. 1973) ....................................................... 31

*In re Motorsports Merch. Antitrust Litig.*,
    112 F. Supp. 2d 1329 (N.D. Ga. 2000) ...................................... 14, 21

*Nelson v. Bennett*,
    662 F. Supp. 1324 (E.D. Cal. 1987) .......................................... 15-16

*In re NVIDIA Corp. Deriv. Litig.*, C 06-06110-SBA (JCS),
    2008 U.S. Dist. LEXIS 117351 (N.D. Cal. Dec. 22, 2008) ............................ 29

*In re Pac. Enters. Sec. Lit.*,
    47 F.3d 373 (9th Cir. 1995) ........................................................... 16

*Polk v. Good*,
    507 A.2d 531 (Del. 1986) ......................................................... 15, 19

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968) ....................................................................... 19

*Ressler v. Jacobson*,
    822 F. Supp. 1551 (M.D. Fla. 1992) ................................................................. 21

*In re Schering-Plough Corp. S'holder Deriv. Litig., CA,* No. 01-1412,
    2008 U.S. Dist. LEXIS 2569 (D.N.J. Jan. 14, 2008) ........................................ 30

*In re Sunbeam Sec. Litig.*,
    176 F. Supp. 2d 1323 (S.D. Fla. 2001) ............................................................. 31

*United Nat'l Ret. Fund v. Watts*, No. 04-3603,
    2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005) ..................................... 19

*Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ....................................................................... 23-24

*Williams v. First Nat'l Bank*,
    216 U.S. 582 (1910) ......................................................................................... 13

*Zimmerman v. Bell*,
    800 F.2d 386 (4th Cir. 1986) ........................................................................... 14

## STATUTES, RULES AND REGULATIONS

Federal Rule of Civil Procedure 23.1 ..................................................................... 13

O.C.G.A.
    § 14-2-332 ........................................................................................................ 17
    § 14-2-742 ................................................................................................ *passim*

## MISCELLANEOUS

7 Alba Conte & Herbert B. Newberg,
    *Newberg on Class Actions* §11:28 at 11-59 (1992) .......................................... 24

*Court Awarded Attorneys' Fees, Report of the Third Circuit Task Force*,
    108 F.R.D. 237 (1985) ....................................................................................... 26

Lead Plaintiffs Nancy A.K. Weyl and John Weyl, by and through their undersigned counsel, hereby respectfully submit this Memorandum of Law in support of their Unopposed Motion for Final Approval of the Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Motion")[1] of the above-captioned shareholder derivative action (the "Action").

## I.    INTRODUCTION

Lead Plaintiffs are pleased to present to the Court for final approval this outstanding resolution of the consolidated derivative action brought on behalf of nominal defendant Equifax, Inc. ("Equifax" or the "Company"), arising out of the 2017 Data Breach.[2] As explained herein, and in the Declaration of Joseph H. Weiss in Support of Lead Plaintiffs' Unopposed Motion for Final Approval of Shareholder Derivative Settlement and Award of Attorneys' Fees and Reimbursement of Expenses (the "Weiss Decl.") filed herewith, the Settlement is the culmination of almost three years devoted to this case and protracted arm's-length negotiations among well-informed, experienced counsel for the Parties and the Demand Review

---

[1]    Without adopting or agreeing with all statements made by Lead Plaintiff herein, Defendants join in Lead Plaintiffs' request that the Court grant final approval of the Parties' Settlement.

[2]    All capitalized terms herein have the same definitions as set forth in the Settlement and Release Agreement dated February 12, 2020 ("Agreement" or "Settlement Agreement" or "Stipulation") (ECF No. 112-1).

Committee of the Board (the "DRC"), with the assistance of leading cybersecurity and corporate governance experts, and a hard-fought mediation before retired Judge Hon. Layn Phillips (the "Mediator"), and represents an excellent result for the Company.

The Settlement provides far-reaching, substantial benefits to Equifax and Current Equifax Stockholders.  The Settlement provides for the recovery of $32,500,000.00 by Equifax from its insurance carriers, which if approved by the Court, is the ***largest*** cash recovery to date in a derivative action premised on an underlying data breach.

Further, the Settlement provides for an exceptionally valuable and comprehensive set of corporate governance and internal control reforms and meaningful and significant structural improvements designed by Lead Plaintiffs and their experts to significantly strengthen the Company's cybersecurity, strongly improving Equifax's ability to prevent future damage from activity similar to that alleged in the Consolidated Complaint (the "Reforms").  These Reforms were developed and formulated with the assistance of a top data security expert retained by Lead Counsel, and include corporate governance and internal control reforms concerning, among other things, cybersecurity, insider trading, Board Committee

duties, responsibilities and membership, and the establishment of a management team dedicated to risk management, as fully set forth in Exhibit A to the Stipulation.

Finally, since commencement of the action, Equifax has (a) made significant personnel changes, and (b) eliminated approximately $2.8 million in incentive compensation payments for certain members of the senior leadership team.

Equifax and Current Equifax Stockholders will benefit immensely from the substantial cash recovery, improved systems and operations, and increased executive and Board oversight of data security.  *See* Declaration of Robert E. Anderson, Jr., in Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ("Anderson Decl.") ¶¶ 11-35; Weiss Decl. ¶¶ 32-36.

These truly substantial benefits, when weighed against the risks, uncertainties, and challenges Lead Plaintiffs would face through continued prosecution of the claims, fully justify this Court's final approval of the Settlement as fair, reasonable, and adequate under applicable law.  In light of the significant benefits obtained as a result of Lead Counsel's and Lead Plaintiffs' initiation, prosecution, and successful resolution of the claims, Judge Phillips' proposal of a Fee and Expense Award of $10,750,000 and Service Award of $2,500 to each of the Lead Plaintiffs (payable from the Fee and Expense Award), which was agreed to by the Parties and the DRC, are supported by law and, it is respectfully submitted, should be approved by the

Court.  As of this date, there have been no objections to either the Settlement or the Fee and Expense Award.[3]

## II.    SUMMARY OF FACTUAL AND PROCEDURAL BACKGROUND[4]

### A. Background to the Litigation

On September 7, 2017, Equifax announced that it suffered a data breach (the "Data Breach") impacting the personal information of nearly 150 million Americans from mid-May through the end of July 2017.  From mid-May through the end of July 2017, the hackers exfiltrated massive amounts of sensitive personal data, including names, dates of birth, Social Security numbers, addresses, driver license numbers, credit card numbers, and tax identification numbers.

### B. The Litigation Demands

Between September 11, 2017 and May 15, 2018, the Equifax Board received multiple shareholder demands made pursuant to O.C.G.A. § 14-2-742 in connection with the Data Breach, including a demand from Lead Plaintiffs (collectively the "Demand Letters").  The Demand Letters asserted that officers, directors, and/or employees of Equifax had engaged in wrongdoing in connection with the Data

---

[3]    The deadline for objections is June 8, 2020.

[4]    A more detailed description of the litigation and related proceedings is set forth in the Weiss Declaration filed herewith.

Breach, including but not limited to breach of fiduciary duties, mismanagement, waste, insider trading, and violations of the federal securities laws. The Demand Letters demanded that the Equifax Board investigate and take appropriate action, including initiating litigation against those found to be responsible.

In response to the Demand Letters, on October 18, 2017, the Equifax Board created the DRC and empowered it to act on the Company's behalf in connection with matters relating to the Demand Letters. The DRC initiated an extensive process, including meeting on over 25 occasions, meeting with Lead Counsel, gaining a detailed understanding of the relevant facts, law, and allegations, and participating in extensive settlement negotiations.

### C. The Consolidated Action

Between January 22, 2018 and March 22, 2018, numerous stockholders, including Lead Plaintiffs, filed derivative complaints on behalf of Equifax naming various Equifax officers and directors as defendants. The derivative actions were consolidated by the Court into the Consolidated Action and after extensive briefing and oral argument, the Court appointed Nancy A.K. Weyl and John Weyl as Lead Plaintiffs and WeissLaw LLP as Lead Counsel.

On July 12, 2018, Lead Plaintiffs filed a Consolidated Complaint alleging claims derivatively on behalf of Equifax against the Individual Defendants for

breaches of fiduciary duties, unjust enrichment, waste, insider trading, and violations of the federal securities laws (the "Consolidated Complaint"). Lead Plaintiffs sought, among other things, monetary damages and the implementation of corporate governance and internal control reforms to prevent, or at least to mitigate the risk of, recurrence of the Data Breach.

On July 19, 2018, the Court entered a stipulated order providing that: (1) the Consolidated Complaint shall serve as the sole operative demand, superseding all prior Demand Letters made pursuant to O.C.G.A. § 14-2-742 in connection with the Data Breach; and (2) Defendants need not answer or respond to the Consolidated Complaint until further order by the Court.

Thereafter, Lead Plaintiffs continued the extensive investigation into the causes of the Data Breach and the remediation efforts that followed, Equifax's internal control systems relevant to prevention of future data breaches, the Company's corporate governance practices and internal control systems, and the laws, rules and regulations relevant to the claims pled in the Consolidated Complaint. After entering into a confidentiality agreement, Equifax produced over three hundred thousand pages of documents to Lead Plaintiffs that were relevant to the circumstances and events at issue in the Consolidated Complaint. Lead Counsel

established a team of attorneys almost exclusively dedicated to reviewing and analyzing the documents produced for a period of several months.

In order to advise them regarding the cybersecurity issues involved in the Action, Lead Plaintiffs retained Robert (Bob) E. Anderson, Jr., who was a Principal of the Chertoff Group and is currently the Chief Executive Officer of Cyber Defense Labs.  Mr. Anderson previously served as the Executive Assistant Director of the FBI's Criminal, Cyber, Response and Services Branch.  In that position, he oversaw all FBI criminal and cyber investigations worldwide, international operations, critical incident response, and victim assistance.  Anderson Decl. ¶¶ 2-6.  Lead Counsel provided Mr. Anderson and his associates, upon their executing an undertaking as required by the confidentiality agreement, the relevant documents produced, as well other publicly available information regarding the circumstances and events at issue.  Anderson Decl. ¶¶ 8, 12.

Lead Plaintiffs also retained Professor Lawrence Hamermesh to advise them regarding the Company's corporate governance practices and internal control procedures, and best practices for corporate governance.  Professor Hamermesh is the Emeritus Professor and the former Ruby R. Vale Professor of Corporate and Business Law at Widener University, Delaware School of Law, and the former Director of the Widener Institute of Delaware Corporate and Business Law.

7

### D. The Settlement

On April 29, 2019, Lead Counsel, together with their cybersecurity expert, Mr. Anderson interviewed Equifax's Chief Information Security Officer (the "CISO") at the Company's headquarters together with the Company's outside and internal counsel, and the DRC's counsel.  Weiss Decl. ¶ 24; Anderson Decl. ¶ 9.  At the meeting, factors related to the Data Breach were discussed, as well as Equifax's subsequent remediation steps and further measures which Lead Plaintiffs and their expert proposed to be taken.  *Id.*

Lead Counsel also conducted a telephonic conference with the DRC and its counsel to discuss the Action, the circumstances and events relating to the Data Breach, and Lead Plaintiffs' views regarding the measures that the Company needed to undertake to remediate alleged internal control weaknesses that they believed led to the Data Breach.  Weiss Decl. ¶ 25; Anderson Decl. ¶ 9.  On May 1, 2019, in order to continue the dialogue initiated in the telephonic conference, Lead Counsel conducted an in-person meeting with the DRC and its counsel in St. Louis, Missouri. At the in-person meeting, there was an exchange of views regarding the strengths and weaknesses of the case, and how Equifax could best remediate those matters that Lead Plaintiffs had identified as constituting alleged internal control and corporate governance weaknesses.  Weiss Decl. ¶ 25.

In May 2019, counsel for the Parties agreed to retain the services of an experienced professional mediator, retired Judge Hon. Layn Phillips, to facilitate resolution of the Action.   Declaration of Layn R. Phillips In Support of Lead Plaintiffs' Motion for Final Approval of Settlement and Award of Attorneys' Fees and Expenses ¶¶ 1-4 ("Phillips Decl.").   The Parties held multiple telephone conferences with Judge Phillips and his staff and drafted Confidential Mediation Statements setting forth their respective positions.  *Id.* ¶ 7.  Thereafter, on May 29, 2019, the Parties, insurance carriers, and Lead Counsel's cybersecurity expert, participated in an in-person, full-day mediation conducted by Judge Phillips at his offices in Newport Beach, California.  *Id.* ¶ 8.  Although the Parties and the insurance carriers engaged in substantial dialogue, they did not reach a settlement at that time. Phillips Decl. ¶ 8; Weiss Decl. ¶ 26.

Over the following months, with substantial additional assistance from Judge Phillips and his staff, the Parties and insurance carriers continued to engage in substantive dialogue concerning settlement, exchanging numerous proposals but not reaching agreement.  Phillips Decl. ¶¶ 9-13; Weiss Decl. ¶ 27.

In December 2019, after the Reforms were agreed upon, Judge Phillips continued to engage substantively with the Parties and the insurance carriers, eventually leading to a Mediator's proposal on the cash component of the Settlement

and thereafter on the Fee and Expense Award.  Phillips Decl. ¶ 13-14.  On December 13, 2019, the Mediator's proposal was conveyed to Lead Counsel and the DRC's counsel.   On December 17, 2019, both Lead Counsel and the DRC's counsel conveyed their acceptance of the Mediator's proposal and an agreement in principle to settle this matter on the terms set forth in the Agreement was reached.  Counsel for the Parties thereafter exchanged e-mails and engaged in telephone conferences for more than a month, negotiating and hammering out the details memorialized in the Stipulation of Settlement.  Weiss Decl. ¶ 28.

This Court granted preliminary approval of the Settlement on February 24, 2020 and Notice to Current Equifax Stockholders has been timely provided, including a second Notice advising them of the videoconference hearing.  *See* ECF Nos. 119, 123-1.  To date, no objections have been received.  Weiss Decl. ¶ 31.

## III.   TERMS AND BENEFITS OF THE SETTLEMENT

The Settlement provides exceptionally valuable benefits to Equifax.   As described above, the Settlement provides for the payment of $32,500,000 to Equifax from its insurers – the ***largest*** ever cash recovery in a derivative action involving a data breach

The Settlement also provides highly meaningful and significant corporate governance and internal control reforms that address the underlying shortcomings

Lead Plaintiffs alleged led to the Data Breach and provide important remedial measures and enhancements that significantly improve the Company's corporate governance practices, which are directly responsive to the allegations in the Consolidated Complaint regarding the Data Breach. Weiss Decl. ¶¶ 32-35. Among the measures[5] adopted are reforms:

(i)     revising the Company's compensation clawback policy to add a financial and reputational harm standard;

(ii)    adding a cybersecurity metric as part of the 2018 and 2019 Annual Incentive Plans;

(iii)   revising the Technology Committee Charter to: (a) add responsibilities related to cybersecurity and technology related risk management; (b) state that all members must be independent, (c) provide that the Technology Committee shall have quarterly executive sessions with the CISO and CTO, (d) authorized engagement of outside advisors, and (e) review escalation protocols with respect to reporting of cybersecurity incidents to management, the Committee, and the Board;

(iv)    revising the Technology Committee and Audit Committee Charters to provide that they coordinate to oversee risk management with respect to cybersecurity and hold joint meetings as appropriate;

(v)     adding cybersecurity to the skills the Governance Committee should consider in its assessment of the Board membership criteria;

(vi)    enhancing and revising Equifax's security and compliance culture, including (a) enhancements to Equifax's security and compliance training program for employees, (b) increasing the number of individuals in the Company's security organization, (c) implementing a new Enterprise Risk Management ("ERM") framework, (d) establishing a new Risk Office, with a direct line of communication to

---

[5]     The entire set of Reforms are attached as Appendix A to the Stipulation and fully set-out in the Weiss Declaration.

the Board, to enhance and coordinate the second line of defense under the Company's updated ERM framework, (e) creating an ERM team within the Risk Office, and (f) enhancing Equifax's risk escalation processes to support rapid escalation and internal notification of cybersecurity incidents;

(vii)   enhancing Equifax's trading policies and procedures by (a) requiring designation of officers to receive immediate notice of any potential security incident and requiring them to evaluate pre-clearance requests under the Insider Trading Policy, and (b) requiring pre-approval of all proposed transactions in Equifax securities by Section 16 reporting persons that are not executed pursuant to a valid SEC Rule 10b5-1 trading plan;

(viii)  providing for relevant updates and written summaries by the CISO to the Audit and Technology Committees and relevant members of the Senior Leadership Team on significant cybersecurity-related issues;

(ix)    specification of the Audit Committee's authority to direct steps to implement or maintain effective internal controls;

(x)     assuring that appropriate cybersecurity due diligence is conducted prior to the acquisition of any new business entities; and

(xi)    enhancing and revising the Company's reporting culture, including (a) quarterly reports to the Audit Committee regarding calls or emails received through the Equifax Integrity Line or by e-mail to the Corporate Ethics Officer, (b) timely, pre-investigation reports by the CLO (or other appropriate person) to either the Chairman of the Audit Committee or the Chairman of the Board, as appropriate, of any whistleblower allegations involving alleged material risks, and (c) the posting of the phone number and email address for the Integrity Line in prominent areas within Company facilities and/or through a link on its employee intranet, as well as in the Code of Conduct that employees are required to review and certify annually.

The Reforms also include significant personnel changes made by Equifax during the pendency of the Action, including the appointment of a new CEO, CISO,

Chief Technology Officer, and Senior Vice President for Enterprise Risk and Compliance, as well as three independent directors.  In addition, the Board exercised its negative discretion to eliminate payments under the 2017 Annual Incentive Plan for certain members of the senior leadership team, with a total value of $2.8 million.

As a result, Lead Plaintiffs believe that the terms of the Settlement are fair, reasonable, and adequate under applicable law, warranting this Court's final approval of the Settlement.

## IV.   ARGUMENT

### A. The Settlement is Fair, Reasonable, and Adequate and Should Be Finally Approved

Federal Rule of Civil Procedure 23.1 requires court approval of the settlement of a shareholder derivative action.  *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).  Compromises of disputed claims are favored.  *Williams v. First Nat'l Bank,* 216 U.S. 582, 595 (1910). Courts should be guided by the "strong judicial policy favoring settlement, as well as by the realization that compromise is the essence of settlement."  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  Settlements conserve "judicial resources by avoiding the expense of a complicated and protracted litigation process."  *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).

"Settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'"   *Maher v. Zapata Corp.*, 714 F. 2d 436, 455 (5th Cir. 1983) (citation omitted); *see also Zimmerman v. Bell*, 800 F.2d 386, 392 (4th Cir. 1986) ("in the case of a derivative action" settlement is favored because it allows "management [to] return its attention and energy from the courtroom to the corporation itself.").

The Court's role in deciding whether to approve a settlement in a representative action is focused upon consideration of the overall fairness, reasonableness, and adequacy of the settlement, not upon determining the result which might have been obtained after trial.   *See Bennett,* 737 F.2d at 986; *In re Chicken Antitrust Litig.*, 560 F. Supp. 957, 960 (N.D. Ga. 1980) (court's role is to evaluate settlement "without reaching ultimate conclusions on the issues underlying the dispute or substituting its business judgment for that of the parties.")

The standard for determining whether final approval is warranted is whether the proposed settlement is fair, adequate and reasonable and not the product of collusion.[6]   *Bennett*, 737 F.2d at 986; *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977).   In evaluating a settlement, courts should consider the following factors:

---

[6]     The role of the court and the criteria to be considered in evaluating the adequacy and fairness of a derivative settlement are substantially the same as in a class action.

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; and (4) the complexity, expense, and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986.[7] Settlements are presumptively fair when they are negotiated at "arms' length" by experienced counsel.  *See Lucas v. Kmart Corp.,* 234 F.R.D. 688, 693 (D. Colo. 2006).  The relevant factors are addressed below, and the application of each supports final approval of the Settlement.

### 1.  The Likelihood of Success at Trial

Shareholder derivative litigation "is notably difficult and notoriously uncertain," *Lewis v. Newman,* 59 F.R.D. 525, 528 (S.D.N.Y. 1973), and settlement is therefore particularly appropriate.  *Nelson v. Bennett,* 662 F. Supp. 1324, 1334 (E.D. Cal. 1987).  Here, Lead Plaintiffs face formidable obstacles to recovery and the likelihood of achieving success at a trial on the merits is far from certain.  *See In re Pac. Enters. Sec. Lit.,* 47 F.3d 373, 378 (9th Cir. 1995) ("the odds of winning [a] derivative lawsuit [are] extremely small").  The Individual Defendants denied any

---

[7]     The *Bennett* factors are very similar to the factors used by Delaware courts when determining the fairness and adequacy of a proposed derivative settlement. *See Polk v. Good*, 507 A.2d 531, 536 (Del. 1986).

wrongdoing and continue to deny any wrongdoing.  If the litigation were to proceed without the Settlement, they would certainly mount a spirited and complex defense. Lead Plaintiffs would likely face dispositive motions, including motions to dismiss and for summary judgment, the outcome of which would be far from certain. Regarding discovery and trial, witnesses could become unavailable or be unable to recall critical information and the trier of fact could react to the evidence in unpredictable and perhaps unfavorable ways.  A further particularly formidable obstacle presented in this case is the formation of the DRC and the argument that it is composed of outside, independent directors who could seek dismissal on the basis of their own investigation and conclusions drawn therefrom.  In these circumstances, "it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end."  *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960).

In addition, while it is clear that Lead Plaintiffs believe that Equifax suffered losses as a result of the conduct challenged in the Complaint, the question of whether Equifax suffered legal, non-exculpated damages is much more complicated. Defendants who are members of the Equifax Board of Directors likely would emphasize the application of Georgia's statutory "raincoat" provision, which could

foreclose personal liability against them except in cases of intentional misconduct or a knowing violation of law. O.C.G.A. § 14-2-332(2).

Further, the significant monetary and corporate therapeutic relief obtained through the Settlement provides immediate, material benefits to Equifax, but continued litigation creates a substantial risk of the Company obtaining a lesser recovery, or no recovery at all. *See Cohn v. Nelson*, 375 F. Supp. 2d 844, 855 (E.D. Mo. 2005) ("[i]n assessing the Settlement, this Court must balance the benefits accorded to [the company] and its stockholders, and the immediacy and certainty of a substantial recovery for them, against the continuing risks of litigation"). That Lead Plaintiffs and Lead Counsel were able to achieve the Settlement in the face of these obstacles is a testament to the Settlement's fairness and reasonableness, and strongly supports final approval of the Settlement.

## 2. The Range of Reasonableness and Possible Recovery

"The second and third factors in the Eleventh Circuit's *Bennett* analysis call for the Court to determine the 'possible range of recovery' and then ascertain where within that range 'fair, adequate, and reasonable settlements lie.'" *Garst v. Franklin Life Ins. Co.*, No. 97-C-0074, 1999 U.S. Dist. LEXIS 22666, at * 64 (N.D. Ala. June 25, 1999). Determination of a "reasonable" settlement does not mean "establishing success or failure to a certainty." *In re Corrugated Container Antitrust Litig.*, 643

F.2d 195, 212 (5th Cir. 1981). Rather, a "just result is often no more than an arbitrary point between competing notions of reasonableness." *Id.*

Here, the Agreement provides for the payment of $32,500,000.00 to Equifax from its insurers – the ***largest*** ever cash recovery in a derivative action brought to remedy issues regarding a data breach. *See, e.g., In re Yahoo! Inc. S'holder Litig.,* Lead Case No. 17-CV-307054 (Cal. Super. Ct., Santa Clara County January 9, 2019) ($29 million cash recovery and proxy disclosures in a derivative action resulting from an underlying data breach, the largest until now) (Weiss Decl. Ex. B–3).

The Reforms negotiated by Lead Plaintiffs may even be more valuable than the cash payment. While it is difficult to ascribe a precise dollar value to such relief, the Reforms plainly have a significant value to the Company now and in the future. [8] The Reforms are specifically designed to bolster data security practices, improve Board and management oversight, and minimize the possibility of future data breach incidents and associated damages. [9] Under applicable law, the Settlement therefore

---

[8]   *See In re Infinity Broad. Corp. S'holder Litig.*, 802 A.2d 285 (Del. 2002) (settlement's future impact properly considered in evaluating its fairness and adequacy); *Cohn*,375 F. Supp. 2d at 854-55 (holding that "[a]s a result of the implementation of the settlement's corporate governance changes, [the corporation] is far less likely to become subject to long and costly securities litigation in the future, as well as prosecution or investigation by regulators and prosecutors.").

[9]   *See Bell Atl. Corp. v. Bolger*, 2 F.3d 1304 at 1311 (3d Cir. 1993) (collecting cases from the Second, Fourth, Fifth, and Sixth Circuits finding that remedial

undoubtedly falls well within the range of reasonableness for the settlement of complex derivative litigation.

### 3. Complexity, Expense, Risk and Duration of Further Litigation Support Approval of the Settlement

The Court should also consider the complexity, expense, and likely duration of continued litigation when determining whether a settlement is fair, adequate, and reasonable. *Bennett*, 737 F.2d at 986; *Polk*, 507 A.2d at 536 (courts should consider the "delay, expense, and trouble of litigation"); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) (holding that a court must consider, *inter alia,* "the complexity, expense, and likely duration of such litigation"); *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981) (noting immediate benefit of settlement and avoidance of costly and lengthy litigation).

---

measures are an adequate basis for settlement of, and judicial approval of, derivative settlements); *Cohn v. Nelson*, 375 F. Supp. 2d at 853 ("Courts have recognized that corporate governance reforms such as those achieved here provide valuable benefits to public companies."); *United Nat'l Ret. Fund v. Watts*, No. 04-3603, 2005 U.S. Dist. LEXIS 26246, at *18 (D.N.J. Oct. 28, 2005) (derivative settlement approved as "fair, adequate, reasonable and proper, and in the best interests" of shareholders where reforms would "protect [the company] from the reoccurrence of certain alleged wrongdoings."); *Citron v. Burns*, C.A. No. 7647, 1985 Del. Ch. LEXIS 382, *6 (Del. Ch. Feb. 4, 1985).

Continued litigation here would involve complex legal and factual issues and could extend for years, during which Equifax would not have the full benefit of the Reforms.  Even if Lead Plaintiffs were successful and defeated the Defendants' expected motions to dismiss and for summary judgment, the claims would then be tested at trial, at which there would be complex issues of proof and damages involving contested expert testimony.  Even if Lead Plaintiffs prevailed at trial, Defendants would likely appeal, which would further delay final resolution of the Action and would cause all Parties to incur additional risks and significant costs. Even very large judgments, recovered after lengthy litigation and trial, can be greatly reduced or vacated post-trial or on appeal.  *See, e.g., Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1340 (11th Cir. 1999) (affirming reduction of $45 million damages award to $4.35 million); *Gregg v. U.S. Indus., Inc.*, 887 F.2d 1462, 1477 (11th Cir. 1989) (affirming reduction of $18.5 million damages award to $2 million). Weiss Decl. ¶ 40 & n.1.

The proposed Settlement eliminates these and other risks of continued litigation.  Thus, this factor also supports final approval of the Settlement.  *See, e.g., Frame v. Hillman*, C.A. No. 01-1083-A, 2002 U.S. Dist. LEXIS 28982, at * 33 (S.D. Cal. July 31, 2002) (approving global settlement and attorneys' fee award to counsel whose "combined efforts achieved remarkable results despite the risks involved"

where counsel "coordinated the information gathering by the many investors . . . and catalyzed the dialogue that ultimately led to this settlement").

### 4. The Reaction of Current Equifax Stockholders Supports Approval of the Settlement

The reaction of shareholders to a proposed settlement is a significant factor to be considered, and the absence of substantial objections is "excellent evidence of the settlement's fairness and adequacy." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1556 (M.D. Fla. 1992); *see also Motorsports Merch.*, 112 F. Supp. 2d at 1338 ("[T]he lack of objections is a further factor weighing in favor of approval of the settlement[].");  *In re Cendant Corp. Deriv. Litig.*, 232 F. Supp. 2d 327, 333-34 (D.N.J. 2002) (where no objections were made, "there is little doubt that this factor weighs in favor of approval").

Here, the Court approved the form and manner of notice of this Settlement that was disseminated. *See* ECF No. 119. Notice was then timely provided to shareholders in accordance with the Court's Order. *See* ECF No. 123-1. The Notice informed Current Equifax Stockholders of their rights under the Settlement, including their right to object. Further Notice was published informing shareholders that the final hearing will be held remotely and providing details on how they can participate in the telephonic hearing. The deadline for submitting objections is June 8, 2020. To date, no objection has been received. Weiss Decl. ¶ 13.

### 5. The Stage of the Proceedings Supports Approval of the Settlement

In evaluating whether to approve a settlement, the Court should consider the "stage of proceedings at which the settlement was achieved." *Bennett,* 737 F.2d at 986. Lead Counsel is well positioned to assess the merits of the case after having pursued the matter since September 2017. Settling the litigation now will allow Equifax to enjoy a cash infusion, as well as the significant benefits of the adoption and continued implementation of the corporate governance and internal control changes required by the Settlement, while eliminating the substantial risks and expense of continued litigation.

In weighing this factor, the Court should focus on whether "[c]ounsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation," and not the extent to which formal discovery has advanced. *Francisco v. Numismatic Guar. Corp.*, No. 06-61677, 2008 U.S. Dist. LEXIS 125370, at * 26 (S.D. Fla., Jan. 31, 2008). Indeed, "formal discovery [is not] a necessary ticket to the bargaining table." *Corrugated Container,* 643 F.2d at 211; *see also Cotton*, 559 F.2d at 1332 (the fact that "very little formal discovery was conducted and there is no voluminous record in this case . . . does not compel the conclusion that insufficient discovery was conducted.").

22

Here, Lead Plaintiffs were well-informed regarding the merits of the Action. Lead Counsel conducted a substantial investigation including the review of over 300,000 pages of internal Company documents, interviewed Equifax's CISO to gain a clear view of the relevant facts and best means of remediation, and met with the DRC and its counsel, in addition to working with their experts, Mr. Anderson and Professor Hamermesh. Lead Counsel were well-positioned to understand the strengths and weaknesses of the claims and to negotiate and obtain a Settlement that provides meaningful relief to the Company. *See Cotton*, 559 F.2d at 1332 (informal discovery and investigation "achieved the desired quantum of information necessary to achieve a settlement"); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) ("[f]ormal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an informed decision about settlement).

### 6. The Settlement is the Result of Good Faith, Arm's Length Negotiations Between Experienced and Capable Counsel

A settlement is presumptively fair, where, as here, the Parties, through experienced and capable counsel, have engaged in arm's-length negotiations with the assistance of an experienced mediator. *Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (applying initial presumption of fairness of a proposed settlement where the settlement was negotiated at arm's length by

experienced counsel); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d Cir. 1995); 7 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §11:28 at 11-59 (1992). The judgment of experienced counsel is particularly informative to the trial court's review of the proposed settlement. *Cotton*, 559 F.2d at 1330; *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 313 (N.D. Ga. 1993) If experienced counsel determines that a settlement is in the best interests of the parties, "the attorney's views must be accorded great weight." Furthermore, courts "presume the absence of fraud or collusion in negotiating the settlement, unless evidence to the contrary is offered." *Newberg*, § 11:51, (4th Ed. 2010).

Here, counsel for all Parties are highly experienced and distinguished members of the bar engaged in the prosecution and defense of complex securities and shareholder derivative actions and are well informed about the strengths and weaknesses of the claims. Lead Plaintiffs entered into the Stipulation only after thoroughly investigating the claims, reviewing hundreds of thousands of pages of relevant internal Equifax documents, carefully weighing all of the available options, participating in extensive settlement negotiations with an experienced Mediator, and working with a cybersecurity expert and corporate governance expert.

Since all of the relevant factors confirm the reasonableness, fairness and adequacy of the Proposed Settlement, Lead Plaintiffs respectfully submit that the Settlement should be fully and finally approved by the Court.

## B. The Agreed-To Fee Award is Fair and Reasonable and Should Be Finally Approved

Lead Counsel also seek final approval of the Fee and Expense Award of $10,750,000. It is well-recognized that counsel who obtain substantial benefits for a corporation in a derivative action are entitled to attorneys' fees and costs. *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). The Fee and Expense Award was negotiated at arm's-length after the Settlement terms had been agreed-upon. The Fee and Expense Award amount was proposed by the Mediator when the Parties were at an impasse and subsequently agreed-upon by all Parties. Phillips Decl. ¶ 12; Weiss Decl. ¶ 38. The Fee and Expense Award is fair and reasonable in light of the significant benefits achieved for Equifax and Current Equifax Stockholders, the effort expended in securing the benefits set forth herein, comparable fee awards in similar cases, and the entirety of the relevant circumstances. *See* Phillips Decl. ¶ 16.

## 1. The Court Should Approve the Negotiated Fee

The Fee and Expense Award was negotiated at arm's-length, which is a strong indication that it is fair and reasonable. *See Hensley v. Eckerhart*, 461 U.S. 424 (1983) (holding that an agreed-to fee is ideal because "[a] request for attorney's fees

should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee.").  Where, as here, there certainly was no collusion – the Parties having been unable to reach agreement on the amount of the fee and having done so only after they each agreed to accept the Mediator's compromise proposal – the Court should give "substantial weight to a negotiated fee amount."  *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 695 (N.D. Ga. 2001); *Court Awarded Attorneys' Fees*, Report of the Third Circuit Task Force, 108 F.R.D. 237 (1985).  The Mediator's, the Parties', and the DRC's valuation of the services rendered, and the benefits achieved, by Lead Counsel strongly supports final approval of the Fee and Expense Award. Phillips Decl. ¶¶ 16-17.

### 2. The Fee and Expense Award is Supported by the *Johnson* Factors.

In determining whether a requested award of attorneys' fees is fair and reasonable, district courts are guided by the factors articulated in *Johnson v. Georgia Highway Exp. Inc.*, 488 F.2d 714, 717-719 (5th Cir. 1974)[10] *abrogated on other grounds Blanchard v. Bergeron*, 489 U.S. 87 (1989).  The *Johnson* factors include: the time and labor required; the novelty and difficulty of the questions involved; the

---

[10]    The Eleventh Circuit has adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

skill required to perform the legal service; the preclusion of other employment due to the acceptance of the case; the customary fee; whether the fee is fixed or contingent; the time limitations imposed; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases. [11]

The *Johnson* factors are not rigid and formulaic but should be applied in light of the circumstances of the particular case. *See In re Catfish Antitrust Litig.*, 939 F. Supp. 493, 502 (N.D. Miss. 1996) ("[N]ot every [*Johnson*] factor need be necessarily considered."). As demonstrated below, application of the pertinent factors supports the fairness and reasonableness of the requested fee.

### a. The Time and Labor Required and the Novelty and Difficulty of the Questions Involved

Shareholder derivative actions are "notoriously difficult and unpredictable." *Maher*, 714 F.2d at 455. This case is no exception. The legal and factual issues presented were difficult and complex and many of the allegations concerning the Company's cyber security, controls, practices, and procedures required substantial and detailed knowledge of technical issues and corporate law.

---

[11]    The *Johnson* factors are similar to those employed by Delaware courts. *See Infinity Broad. Corp.*, 802 A.2d at 293.

Additionally, as set forth above, Lead Counsel undertook significant efforts and incurred substantial out-of-pocket expenses in the course of the litigation.  All told, Lead Counsel, together with the firms to which they assigned work, have expended 10,491 hours in the prosecution and settlement of this action, for a lodestar of $6,899,072.50, and have incurred $100,537.92 in unreimbursed out-of-pocket expenses.  *See* Weiss Decl. at ¶¶ 59, 61.  This represent a multiple of 1.543 to lodestar, and is well-within the fees and lodestar multiples awarded in similar derivative actions.  *Id.* at ¶ 56, The contemporaneous time and expense reports were submitted to the Court on a quarterly basis during the course of the litigation. *Id.* at ¶¶ 59, 61.

### b.  The Amount Involved and the Results Obtained

The substantial benefits conferred upon Equifax and its shareholders are perhaps the most important factor for the Court to consider.

While the $32.5 million cash recovery here is very substantial and unprecedented in derivative data breach litigation, the Reforms are perhaps even more valuable to Equifax and independently warrant the approval of the Fee and Expense Award.  As the Supreme Court explained, "a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature." *Mills v. Electric Auto-Lite*

*Co.*, 396 U.S. 375, 395, 396-97 (1970); *Maher*, 714 F.2d at 436, 457-58 n.38 (awarding attorneys' fees where the "lawsuit was at least a contributing factor in several major beneficial changes in Zapata Corporation").[12]  The Reforms aim to prevent the potentially extraordinary liability and reputational harm that would be caused by another data breach like the Data Breach underlying this Action.  As such, they are at least as valuable to Equifax as the monetary recovery, if not more so, and independently establish the fairness and reasonableness of the Fee and Expense Award.  Indeed, numerous courts have awarded comparable fees, even higher fees, in complex derivative actions in which a cash recovery was achieved along with corporate governance reforms, as well as cases where corporate governance reforms were the sole consideration for the settlement.[13]

---

[12]     S*ee also In re AOL Time Warner S'holder Deriv. Litig.*, 2009 U.S. Dist. LEXIS 124372, at * 48 (S.D.N.Y. Feb. 1, 2010) ("Though the value of these reforms cannot be reduced scientifically to dollars and cents, counsel are entitled to sizeable compensation for this corporate *mea culpa* and measures that enhance[] the company's goodwill, standing and profitability into the future."); *In re NVIDIA Corp. Deriv. Litig.*, C 06-06110-SBA (JCS), 2008 U.S. Dist. LEXIS 117351, at * 9-10 (N.D. Cal. Dec. 22, 2008) ("As corporate debacles such as Enron, Tyco and WorldCom demonstrate, strong corporate governance is fundamental to the economic well-being and success of a corporation.").

[13]     *See In re Wells Fargo & Co. S'holder Deriv. Litig.*, Lead Case No. 16-cv-05541-JST (N.D. Cal. 2019) ($52.8 million fee for cash recovery and enactment of corporate governance reforms); *Sadowsky Testamentary Trust v. Brendsel et al. f/b/o Fed. Home Loan Mortg. Corp.*, Case No. 05-CV-2596 (JES) (S.D.N.Y. 2006) ($18 million fee for cash recovery and enactment of corporate governance reforms); *City of Pontiac Gen.*

### c.  The Skill, Experience, and Reputation of Counsel

The experience, reputation, and ability of counsel is another factor the Court should consider when determining whether a fee award is fair and reasonable. *Johnson*, 488 F.2d at 717-19.  Lead Counsel has an exemplary record of achievement in shareholder litigation.   In addition, Equifax, the DRC and the Individual Defendants are represented by experienced, able counsel from national, highly respected law firms, and they have zealously defended their clients' interests throughout the course of the Action.

---

*Emps.' Ret. Sys. v. Langone, et al.*, Findings of Fact in Support of Order and Final Judgment, No. 2006-cv-122302 (Ga. Sup. Ct., Fulton Cnty., June 10, 2008) ($14.5 million fee for corporate governance reforms, with no monetary recovery); *In re Yahoo! Inc. S'holder Litig.*, Lead Case No. 17-CV-307054 (Cal. Super. Ct., Santa Clara County January 9, 2019) (almost $10.7 million fee for $29 million cash recovery and additional proxy disclosures in a derivative action resulting from an underlying data breach); *In re: Marsh & McLennan Co. Inc. Deriv. Litig.*, Civil Action No. 753-VCS (Del. Ch. March 25, 2010) ($10 million fee for cash recovery and enactment of corporate governance reforms); *In re Activision, Inc. Deriv. Litig.*, No. CV-06-04771, slip op. (C.D. Cal. July 21, 2008) ($10 million fee for corporate governance reforms and repricing of mispriced options; no cash recovery); *Google Inc. S'holder Deriv. Litig.*, CV-11-04248-PJH (N.D. Cal. Jan. 21, 2015) (awarding $9.9 million fee for corporate governance reforms with no cash recovery); *In re Schering-Plough Corp. S'holder Deriv. Litig.*, CA No. 01-1412, 2008 U.S. Dist. LEXIS 2569, at *18 (D.N.J. Jan. 14, 2008) ($9.5 million fee for corporate governance reforms and no cash recovery); *In re Motorola, Inc. Deriv. Litig.*, No. 07CH23297 (Ill. Cir. Ct., Cook Cnty.) ($9.5 million fee for corporate governance reforms and no cash recovery).

### d.  The Contingent Nature of the Fee

The risk of receiving no recovery is a major factor in awarding attorneys' fees. *See, e.g., In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d. 1323, 1335 (S.D. Fla. 2001); *Milstein v. Werner*, 58 F.R.D. 544, 549 (S.D.N.Y. 1973) ("Derivative suits . . . require the initiative of shareholders to commence the suit, and the probable level of compensation for attorneys as a practical matter directly effects the ability of shareholders to exercise such initiative. Thus, fee allowances in this area should be viewed as an incentive, as much as a just reward for services performed.")

Here, Lead Counsel undertook derivative claims with difficult and novel legal and factual issues against well-financed Defendants, with no guarantee of a successful resolution or compensation for their efforts.  Despite the risks of litigation, Lead Counsel expended significant time and resources and negotiated a very meaningful and favorable settlement.  Weiss Decl. ¶¶ 8, 59.  Given the risks involved in the Action, the fully contingent nature of the representation further supports the agreed upon Fee and Expense Award.

### e.  Awards in Similar Cases

Where, as here, in an important complex derivative action both a monetary recovery and therapeutic relief has been provided by the Settlement, courts have

31

awarded similar fees to the counsel responsible for that outstanding result. *See* fn. 13, *supra*; Weiss Decl. ¶ 58.

### C. The Service Award should be Approved

Finally, the Stipulation provides that Lead Counsel will apply for a Service Award to each of the Lead Plaintiffs in the amount of $2,500 to be paid from the Fee and Expense Award. Such awards are customary to reward plaintiffs for doing a "public service" by stepping forward and enforcing valuable shareholder claims. *Cendant Corp.*, 232 F. Supp. 2d at 327 (approving award of $25,000 to the lead plaintiff). The Lead Plaintiffs worked together Lead Counsel to achieve an excellent result for the Company and, as such, it is respectfully submitted that the Service Award should be approved.

## IV.   CONCLUSION

For the reasons set forth above, Lead Plaintiffs respectfully submit that the Settlement, including the agreed upon Fee and Expense Award and the Service Award, is fair, reasonable, and adequate and should be finally approved by the Court.

Dated: June 1, 2020

WEISSLAW LLP

Joseph H. Weiss
David C. Katz
Mark D. Smilow
Joshua M. Rubin
1500 Broadway, 16th Floor
New York, New York 10036
Telephone: (212) 682-3025
Facsimile:  (212) 682-3010
Email: jweiss@weisslawllp.com
        dkatz@weisslawllp.com
        msmilow@weisslawllp.com
        jrubin@weisslawllp.com

Michael A. Rogovin
Georgia Bar No. 780075
476 Hardendorf Ave. NE
Atlanta, Georgia 30307
Telephone: (404) 692-7910
Facsimile: (404) 795-5778
Email: mrogovin@weisslawllp.com

*Attorneys for Lead Plaintiffs*
*Nancy A.K. Weyl and John Weyl*
*and Lead Derivative Counsel*

33